THE STATE *ex rel.* ROLSTON *et al.*, *Trustees*, v. CHAPPELL, *State Treasurer.*

The State's Lien on the Hannibal & St. Joseph Railroad: ACT OF 1865 REPEALED BY CONSTITUTION OF 1875. The act of February 20th, 1865, entitled "An act to provide for reducing the indebtedness of the State," (Acts 1865, p. 84,) provided that whenever certain trustees to be created by the Hannibal & St. Joseph Railroad Company should pay into the State treasury "a sum of money equal in amount to all indebtedness due or owing by said company to the State and all liabilities incurred by the State by reason of having issued her bonds and loaned the same to said company as a loan of the credit of the State, together with all interest that has and may,

at the time when such payment shall be made, have accrued and remain unpaid by said company," then it should be the duty of the governor of the State to assign and convey to the trustees the liens on the railroad of said company reserved to the State by certain prior acts for the security of such loans. These prior acts provided for the enforcement of these liens by sale of the road in case of default by the company in paying either principal or interest of the bonds. Section 50, article 4 of the constitution of 1875, declares that "the general assembly shall have no power to release or alienate the lien held by the State upon any railroad or in anywise change the tenor or meaning or pass any act explanatory thereof; but the same shall be enforced in accordance with the original terms upon which it was acquired." The Hannibal & St. Joseph Railroad Company did not accept the act of 1865, or appoint trustees or take any other action under it until after the adoption of the constitution. *Held*, that if the act meant that the trustees should be entitled to acquire the liens upon payment only of the principal of the bonds with interest accrued to the date of payment, and without providing for interest yet to accrue, (as the trustees claimed it did,) it was inconsistent with and repugnant to the last clause of the constitutional provision quoted, and since it did not of itself create any vested right and was not accepted before the constitution took effect, it ceased to be operative as soon as that event occurred.

*Mandamus.*

PEREMPTORY WRIT DENIED.

*Geo. W. Easley* and *Elihu Root* for relators.

The act of February 20th, 1865, (Sess. Acts 1865, p. 84,) when accepted by the company and the bonds issued thereunder, and delivered to the trustees and sold by them and the proceeds thereof paid into the State treasury, converted the act into a contract to convey the lien of the State to the trustees. *Ketchum v. Pacific R. R. Co.*, 4 Dill. 79. This character of contract to convey the lien of a mortgage has been upheld in a mortgage between individuals, (*Coffing v. Taylor*, 16 Ill. 457,) and seems to have been the well defined policy of the State in disposing of liens on railroads to secure loans thereto. Acts 1868, pp. 95, 112, 114. The " sum of money equal in amount to all in-

debtedness due or owing by the said company to the State and all liabilities incurred by the State by reason of having issued her bonds and loaned the same to said company as a loan of the credit of the State," designated in the 2nd section, is the same sum of money designated as "the $3,-000,000" in the 3rd section. Acts 1865, pp. 84, 85, §§ 2, 3. The amount paid on the 20th of June, 1881, being the full amount of the State's loan and all accrued interest, up to that date, there can be no interest due to the State thereafter, because she has the money, and like cases of partial payments, the same rate of interest must be cast on the payment as on the original loan, so that in this case interest on the debt and interest on the payment equal and cancel each other. *Riney v. Hill*, 14 Mo. 500; Waterman on Set-off, (2 Ed.) § 663; 1 Pothier on Obligations, (3 Am. Ed.) 448, 469; Barbour on Set-off, 18; *Wallis v. Bastard,* 31 Eng. L. & E. 175; *Meriwether v. Bird,* 9 Ga. 594. The act of February 20th, 1865, is the only authority the trustees had for making the payment of June 20th, 1881. That act was the only authority the State officers had to accept it. That act requires the payment of a sum equal to all indebtedness and liabilities to the State on account of the loan. If the payment was not enough to entitle the trustees to a conveyance, the State officers should have declined it. It was offered under that act to acquire that lien, and the State officers were bound to accept as offered, or reject it. They could not take the money and prescribe their own terms of acceptance. *Adams v. Helm,* 55 Mo. 469. No constitutional question can arise in this case, because the act of February 20th, 1865, went into effect before the constitution or ordinance of 1865. Besides, neither the constitution or ordinance prohibited the sale of the State's lien. *Murdock v. Woodson,* 2 Dill 188; *Woodson v. Murdock,* 22 Wall. 351.

22   74

*D. H. McIntyre,* Attorney General, for respondent.

The respondent declines to execute and deliver the said certificate upon the ground that the said company has not complied with the provisions of said act; that they have not paid into the treasury of the State a sum of money equal in amount to all indebtedness due or owing by said company to the State, and all liabilities incurred by the State by reason of having issued her bonds and loaned the same to said company as a loan of the credit of the State, together with all interest that has and may at the time when such payment shall be made, have accrued and remain unpaid.

NORTON, J.—The relators file a petition for mandamus, stating:

1.   That the relators are trustees in a mortgage made by the Hannibal &. St. Joseph Railroad Company on the 30th day of April, 1881, in pursuance of an act of the general assembly of the State of Missouri, entitled "An act to provide for reducing the indebtedness of the State," approved February 20th, 1865   That act is as follows:

Section 1.   The Hannibal & St. Joseph Railroad Company is hereby authorized to issue its bonds, signed by the president and countersigned by the secretary of the company, in sums of $1,000 each, with coupons attached, bearing interest, payable semi-annually, at the rate of six per cent per annum, and having not less than ten years to run, and to the amount of $3,000,000, the payment of the same, with the accruing interest, to be secured by a mortgage or deed of trust conveying to three trustees, to be named therein, by and with appropriate forms of expression, and for the purpose of securing the payment of said bonds and interest, and for no other purpose, on the road of said company, with all its franchises, rolling stock and appurtenances, subject, however, to all the liens and liabilities

existing in favor of the State by virtue of any law of the State at the time said bonds may be issued and delivered.

Section 2. Whenever the trustees provided for in the 1st section of this act shall pay into the treasury of the State *a sum of money equal in amount to all indebtedness due or owing by said company to the State, and all liabilities incurred by the State, by reason of having issued her bonds and loaned the same to said company as a loan of the credit of the State, together with all interest that has, and may at the time when such payment shall be made, have accrued and remain unpaid by said company,* and such fact shall have been certified to the governor of the State by the treasurer, who is hereby directed to make such certificate, then the governor of the State is hereby authorized and required to make over, assign and convey to the trustees aforesaid all the first liens and mortgages now held by the State under the provisions of an act of the legislature of the State, approved February 22nd, 1851, to secure the payment of a loan of the credit of the State to said railroad company in the sum of $1,500,000, and also of an act of the legislature, approved December 10th, 1855, to secure the payment of a like loan of the credit of the State in the sum of $1,500,000; and such conveyance shall, by appropriate expressions, convey to said trustees, all and singular, the rights, titles and interests held by the State under the several acts of the legislature as aforesaid in and to said railroad, its rolling stock, franchises and appurtenances, to hold the same as security for the payment of the bonds of the road authorized by the 1st section of this act, and the interest thereon, with full power to sell and dispose of the same, in case of the failure of said company to meet and pay, at maturity, the interest or principal of the said bonds, or any of them, and to have and exercise all the rights and powers which belong to the people of the State of Missouri, and which, by the provisions of the acts of the legislature as aforesaid, they might have exercised by and through the governor of the State; *Provided,* that nothing in this act shall be con-

strued so as to render the State of Missouri liable in any case for the payment of the bonds, or interest thereon, authorized to be issued by the 1st section of this act.

Section 3.   The treasurer of the State is hereby authorized and directed to receive of the trustees aforesaid, *in payment of the* $3,000,000 *and interest, as provided in the 2nd section of this act,* any of the outstanding bonds of the State bearing not less than six per cent interest, or of the unpaid coupons thereof at their par value.

Section 4.   The true intent and meaning of this act is to place the persons and parties who may hold the bonds of the road authorized to be issued by the 1st section of this act, through the trustees herein provided, in the same legal position which the people of the State of Missouri now hold, with full powers to act in the premises as the said State, by its governor, might have done; and it shall be the duty of such trustees to proceed to advertise and sell the road and its appurtenances as aforesaid, and in the manner provided for the sale of the same by the governor of the State in the acts of the legislature aforesaid, whenever they shall receive a request so to do, in writing, signed by persons and parties representing not less than one-third of the bonds authorized to be issued by the 1st section of this act, and which may be still outstanding, but only in case the said railroad company shall have made default in the payment of the principal or interest on said bonds when the same has become due, and all needed authority to do the same shall be maintained, and all needed decrees shall be issued by and in any court of competent jurisdiction in this State, either in law or equity, and such sale so made, as herein provided, shall be deemed and held in all respects good and valid in law.

Section 5.   The provisions of this act shall not be construed to modify, release, exonerate, discharge or relieve said railroad company from any duty, liability, obligation, penalty or forfeiture to which, under former laws, said company may be liable to the people of the State of Mis-

souri, on any account whatever, except from the payment of the several sums of money as in this act provided.

Section 6. This act to take effect from and after its passage   Acts 1865, p. 84.

2. That the respondent on the 20th day of June, 1881, was, ever since has been and now is, State treasurer of the State of Missouri.

3. The incorporation of the Hannibal & St. Joseph Railroad Company.

4. The loan of the credit of the State to the railroad company under the act of February 22nd, 1851, (Sess. Acts 1851, p. 265,) to the amount of $1,500,000 ; a like loan of the credit of the State to the company for a like amount, under the act of December 10th, 1855, (Sess. Acts 1855, p. 472,) and that these loans were declared to be a first lien or mortgage on the railway of the company.

One of the provisions made by the act of December 10th, 1855, for the payment of the principal and interest of bonds issued and loaned by the State, was as follows : Section 5. In addition to the provisions already made by law for the payment, by said companies, of the interest and principal of the bonds of the State hereafter to be issued under this or any former law for the benefit of the railroad companies in this act mentioned, there shall be paid by the companies, respectively, to the treasurer of this State, one and a quarter per cent in each year on each thirty-year bond, and two and a half per cent in each year on each twenty-year bond so sold or hypothecated, the first year's payment to be made within sixty days after the sale or hypothecation of such bond, and such other annual payment on the 1st day of January in each year thereafter, which percentage shall be invested at not less than seven per cent interest, in such securities as are provided for in this act, and also from the net profits arising from said roads after the same shall be completed and in operation, respectively, a sum equal to not less than ten per cent per annum upon the net earnings of said roads, which said sums so paid to

the treasurer of the State shall constitute a sinking fund for the purpose of paying the bonds of the State so issued and to be issued as aforesaid, at maturity, to said companies respectively.

This section has been suspended by the following section, (Sess. Acts 1868, p. 123:)    Section 1.    The 5th section of an act entitled "An act to secure the completion of certain railroads in this State," certified, under date of December 10th, 1855, as having passed over the governor's veto, is hereby suspended as to any and all railroads or railroad companies which have heretofore promptly met and paid all interest due on bonds of the State loaned to the same, or bonds in any manner guaranteed or secured thereto or therefor by the State, and which shall hereafter pay or cause to be paid promptly, as the same shall become due, any and all such indebtedness, both principal and interest; but upon any failure to promptly pay such indebtedness, or any part thereof, as aforesaid, at any time hereafter, this suspension shall abate and forever cease, as to any, each and all such companies or roads so failing, and all and singular the sums and amounts as specified in the said section, suspended as aforesaid, shall thereupon at once become due and payable, as in said section specified.

5.    That all interest that had accrued upon the bonds issued and loaned to said company as aforesaid, has been paid by the railroad company up to and including January 1st, 1881.

6.    That in pursuance of the act of February 20th, 1865, the Hannibal & St. Joseph Railroad Company did, on the 30th day of April, 1881, issue its bonds to the amount of $3,000,000, signed by the president and countersigned by the secretary of the company, in sums of $1,000 each, with coupons attached, bearing interest payable semi-annually at the rate of six per cent per annum, and having ten years to run, and delivered the same to Roswell G. Rolston, Heman Dowd and Oren Root, Jr., trustees, the relators herein, and upon the day last aforesaid, the Han-

nibal & St. Joseph Railroad Company did, by the mortgage
or deed of trust, by and with appropriate forms of expres-
sion, convey to the said Roswell G. Rolston, Heman Dowd
and Oren Root, Jr., trustees, the relators herein, the road
of said company, with all its franchises, rolling stock and
appurtenances, subject, however, to all the liens and lia-
bilities existing in favor of the State by virtue of any law
of the State at the time of the issuance and delivery of
said bonds to said trustees ; that said trustees, the relators
herein, sold and negotiated said bonds to divers persons
too numerous to mention herein, and received the funds
arising and realized therefrom ; that with the funds arising
from the sale and negotiation of said bonds, together with
the sum of $90,000, the amount of interest from the 1st
day of January to the 1st day of July, 1881, upon the $3,-
000,000 loan of the credit of the State of Missouri, which
was furnished and provided to said trustees, relators herein,
by the Hannibal & St. Joseph Railroad Company, the said
trustees, the relators herein, did, on the 20th day of June,
1881, pay into the treasury of the State the sum of $3,-
090,000, and upon that day the treasurer of the State did
receive the same and place the same in the treasury of the
State.

7. That the relators thereupon demanded of the re-
spondent that he certify to the governor of the State of
Missouri that the relators had paid into the treasury of the
State " a sum of money equal in amount to all indebted-
ness due or owing by said company to the State, and all
liabilities incurred by the State by reason of having issued
its bonds and loaned the same to said company as a loan
of the credit of the State, to-wit : The sum of $3,000,000,
together with all interest that had accrued and remained
unpaid at the time of the payment by the relators, to-wit:
The sum of $90,000," and the respondent then, and ever
since has refused to execute or deliver to the governor such
certificate, and will only receipt for and certify that relat-
ors have paid said money on account of the statutory

mortgage the State holds against the Hannibal & St. Joseph Railroad.

8. That without such certificate the relators will be unable to obtain the conveyance of the State's lien on said railroad, as provided in said act of February 20th, 1865, and that the holders of the bonds issued under said last named act are without security for the payment of said bonds and interest thereon, and will suffer great pecuniary loss, unless relief is afforded in this proceeding, (there being no other legal remedy,) and respondent required to execute the certificate required by the act of February 20th, 1865. It is further alleged that the company is not indebted to the State, nor has the State incurred any other liability for said company than such as may arise for future interest on the bonds issued by the State and loaned to the company.

There is a stipulation filed waiving the issuing of an alternate writ, and agreeing that the petition may stand as and for such writ.

Mr. Chappell, the respondent, has interposed a demurrer to this petition, which calls for a construction of the act of February 20th, 1865, recited in the petition, and under which relators claim that in virtue of their payment into the treasury of the State of the sum of $3,090,000 they are entitled to a certificate from the treasurer certifying to the governor that the payment thus made is equal in amount to all that they were required to pay under said act, and that by reason of said payment it is their right to have the lien of the State upon the Hannibal & St. Joseph Railroad transferred or assigned to them.

At the threshold of the inquiry we are thus called upon to make, we are met with the following provision of the constitution of 1875, viz: Section 50, article 4, which is as follows: " The general assembly shall have no power to release or alienate the lien held by the State upon any railroad, or in anywise change the tenor or meaning or pass any act explanatory thereof; but the same shall be enforced

in' accordance with the original terms upon which it was acquired."

Section 15, article 11 of the constitution of 1865, provided as follows : "The general assembly shall have no power, for any purpose whatever, to release the lien held by the State upon any railroad." If said section 50 in the constitution of 1875 had gone no farther than the provision in the constitution of 1865, it might be successfully contended, under the doctrine laid down by this court in the case of the *State ex rel. v. Macon Co. Ct.*, 41 Mo. 453, that it did not have the effect of repealing any law relating to the release or alienation of a lien held by the State on a railroad, which had been passed anterior to the adoption of the constitution of 1875, but that it was intended only to prohibit the legislature from passing any law, after the constitution was adopted, releasing or alienating the lien of the State upon a railroad. It will, however, be observed that it goes much farther and has a broader and more extensive meaning than section 15, *supra*, in the constitution of 1865. Said section 50, after denying to the general assembly the power to pass any law releasing or alienating the State's lien on a railroad, or to pass any law changing the tenor and effect of such lien, or any law explanatory thereof, announces, as the fixed and absolute rule to govern in all cases of liens held by the State on a railroad, that they shall be enforced in accordance with the original terms upon which such liens were acquired. The lien held by the State on the Hannibal & St. Joseph Railroad was acquired under acts of the general assembly, passed in 1851 and 1855. In these acts, among other things, it was provided that upon any default in the payment of the bonds of the State issued to the Hannibal & St. Joseph Railroad Company, or any default in the payment of the interest thereon, the lien should be enforced by a sale of the road to be made by the governor. The constitution declares, in language too plain to be misunderstood, that the lien acquired by the State under these acts shall be enforced

according to the terms prescribed therein, while the act of 1865, according to relators' construction of it, declares it shall not be so enforced. If the act of 1865 means what relators contend it does, it is repugnant to and inconsistent with the constitutional provision above quoted. The acts of 1851 and 1855 under which the lien of the State was acquired provide for a sale of the road by the governor upon any default made by the company in payment of interest, while the act of 1865 under relators' construction of it, puts it out of the power of the governor to sell upon any default in the payment of interest occurring after the 1st day of July, 1881. The act of 1865, according to relators' construction, provides for an enforcement of a part only of the lien of the State, while the acts under which the lien was acquired provide for the enforcement of all of said lien. The mandate of the constitution is, that the lien shall be enforced according to the acts conferring or creating it, while the act of 1865 in effect declares it shall not be so enforced.

The act of 1865, if construed as it is in the petition of relators, cannot stand with said section 50 of the constitution. One or the other must fall. Which is to prevail? This question is answered by section 1 of the schedule, article 15 of the constitution, which is as follows : "That all laws in force at the adoption of this constitution not inconsistent therewith, shall remain in full force until altered or repealed by the general assembly, and all rights, actions, prosecutions, claims and contracts of the State, counties, individuals or bodies corporate not inconsistent therewith, shall continue to be as valid as if this constitution had not been adopted. The provisions of all laws which are inconsistent with this constitution shall cease upon its adoption, except that all laws which are inconsistent with such provisions of this constitution as require legislation to enforce them, shall remain in force until the 1st day of July 1877, unless sooner amended or repealed." So that it follows, when the constitution of 1875 sprang

into life, on the 30th day of November, 1875, the act of 1865, because of its inconsistency therewith, died and ceased to exist.

In October, 1874, in the case of *Woodson v. Murdock*, 22 Wall. 351, the Supreme Court of the United States was called upon to construe section 15, article 11, of the constitution of 1865, which declared that "the general assembly shall have no power, for any purpose whatever, to release the lien held by the State upon any railroad." The main point in judgment in that case was, whether an act passed by the general assembly in 1868, which provided that if the Pacific Railroad Company, whose debt or liability to the State amounted to about $9,000,000, secured by a lien on its road, should at any time within ninety days after the 1st day of April, 1868, pay into the treasury of the State the sum of $350,000, in bonds of the State, or in money, then, and in that event, the governor should not advertise the road for sale; and if the company should, within ninety days thereafter pay into the treasury of the State an additional sum equal to $5,000,000 in all, (either in cash or Missouri State bonds,) the governor should, upon the production of the receipt of the State treasurer for said amounts, execute and deliver to the said Pacific Railroad Company a deed of release for all claim, title and interest which the State of Missouri had in and to the railroad, its property and appurtenances, and that the Pacific Railroad Company should, from and after the delivery of the deed, be fully discharged from all claims or debts due the State and all liability growing out of the issue of the bonds of the State to aid in the construction of their railroad. A majority of the court said that this act was not unconstitutional, holding that said section 15 of the constitution of 1865, was not meant, in case of a failure by any railroad company, to prevent the State from making a compromise with that company of any debt due to it or to become due, and on the compromise being effected to release the lien of the State. Justice Miller, in an exhaustive dissenting opin-

ion, concurred in by Justice Davis, held that the said act
was violative of the constitutional prohibition, which, in
their opinion, meant that both the debt and lien for secur-
ing the debt should remain inviolate, except by payment.

The framers of the constitution of 1875, in the full
light of this decision and in view of the interpretation
which had been thus put upon section 15, *supra*, of the
constitution of 1865, when they came to deal with the ques-
tion, inserted section 50, *supra*, which not only prohibited
the general assembly from passing any law releasing or
alienating the lien of the State upon any railroad, but also
prohibited it from passing any law changing the tenor or
effect of said lien, or any law explanatory thereof. The
framers of the constitution, not content with thus bridling
and restraining the general assembly, and denying it the
power to pass any law changing the status of any lien upon
a railroad held by the State, proceeded to announce affirm-
atively, in mandatory language, and lay down an abso-
lute, unbending rule, that every lien held by the State on
a railroad should be enforced according to the original
terms of the act or acts conferring the lien. It is a matter
of which we can take judicial cognizance, that at the time
the constitution of 1875 was framed, all the liens held by
the State on railroads, except its lien upon the Hannibal &
St. Joseph Railroad, had been frittered away and extin-
guished, and said section 50 was doubtless inserted in the
constitution to prevent the occurrence of any such thing
in the future. At the time the constitution of 1875 was
framed, the State held but one lien upon a single railroad,
and that road was the Hannibal & St. Joseph Railroad, and
in the light of this fact the latter clause in said section 50
might well be read as follows: But the lien held by the
State upon the Hannibal & St. Joseph Railroad shall be
enforced according to the original terms prescribed in the
acts of 1851 and 1855, under which it was acquired.

This view of the subject is, we think, greatly strength-
ened by the fact that the prohibitions contained in sections

45 and 46, article 4 of the constitution, forbade the general assembly from giving or lending, or authorizing the giving or lending of the credit of the State in aid of any corporation, or from pledging the credit of the State in any manner whatever for the payment of the liabilities present or prospective, of any corporation, or from making any grant or authorizing the making of any grant of public money to any corporation. It appears that these prohibitions effectually cut off the power of the State after the adoption of the constitution to acquire a lien upon any railroad, because under them the State could do nothing to create between it and railroad companies the relation of debtor and creditor. It therefore follows from the fact that the Hannibal & St. Joseph Railroad at the time the constitution was framed, was the only railroad in the State upon which the State held a lien, and from the fact that after the adoption of the constitution, because of said prohibition, the State could acquire no other lien, that the Hannibal & St. Joseph Railroad was the only road to which the latter clause of said section 50 could apply.

Inasmuch as there was no acceptance (so far as the petition of relators shows) of the act of 1865 by the Hannibal & St. Joseph Railroad Company prior to the adoption of the present constitution, nor any act done under it, conferring any right prior to that time, none of the elements of a contract exist between the State and the Hannibal & St. Joseph Railroad Company, or the relators herein, growing out of the passage of said act. The petition of relators shows affirmatively that the only action taken which could be construed as an acceptance of said act, occurred in April, 1881, sixteen years after the passage of the act, and more than five years after it ceased to be a law, by virtue of the provisions contained in section 50, article 4, and section 1 of the schedule, article 15 of the constitution of 1875. Had such action been taken anterior to the adoption of the present constitution a different question would have been presented, but as such action was

not taken, the question which would have grown out of it
is not before us.

It may also be observed that it is well settled law that
the privilege a railroad company may have, either under a
general or special law of the State, of receiving a subscrip-
tion to its stock from a county, city or town, is not a vested
right, and does not become so until subscription is actually
made, and the law conferring it may be repealed at any
time before the subscription is made. *State ex rel. v. Gar-
routte*, 67 Mo. 446, 461; 1 Dillon Munic. Corp., § 42; *As-
pinwall v. Commissioners of County of Daviess*, 22 How. 364;
*St. Joseph & Denver City R. R. Co. v. Buchanan Co. Ct.*, 39
Mo. 485; *County of Dallas v. McKenzie*, 94 U. S. 660; *Mo.
Pac. R'y Co. v. Davis Co.*, 6 Kas. 256. So neither did the
act of 1865 vest any right until some action therein per-
mitted had been taken under it.

For the reasons herein given the demurrer will be sus-
tained, the peremptory writ asked denied, and the petition
dismissed. SHERWOOD, C. J., HOUGH, RAY and HENRY, JJ.,
concurring; HENRY, J., expressing his views in a separate
opinion.

## Separate Opinion.

HENRY, J.—The only question discussed by counsel,
either in their briefs or oral arguments, relates to the con-
struction of the act of 1865, under which the $3,090,000
were paid. The court has decided the case on a question
to which the attention of the counsel had not been called,
and while I concur in the views expressed in the opinion
delivered, I thought, and still think, before finally decid-
ing the case on that ground, opportunity should have
been afforded relators to be heard on the constitutional
question discussed by the court. While I am inclined to
think that the views expressed in the opinion are sound, so
little time has been given for a thorough investigation
of the subject, that I would be better satisfied with my

concurrence, if after argument of the question by counsel, I adhered to the opinion I now entertain. In an ordinary case the court may well determine it on a question not discussed or mentioned by counsel without ordering a reargument, but this is a case of vast importance to the State, the relators and the Hannibal & St. Joseph Railroad Company. Questions may, and probably will, arise on the anomalous condition in which the money is held by the State under this decision, of a most embarrassing character to all parties concerned, and while I have fully for myself determined the question as to the proper construction of the act of 1865, I would be much better satisfied if the constitutional question involved had been decided after as full a discussion of the subject at the bar.